# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Robert Elliott, et al.,

    Plaintiffs

v.

State of Nevada, et al.,

    Defendants

Case No.: 2:23-cv-00680-JAD-NJK

**Order Screening Complaint**

Plaintiffs Robert Elliott, Samisoni Taukitoko, Bradley Sandefur, Cody Braese, Bradley Carver, Demian Dominguez, Andrew Fowler, Billie Ross, and Samuel Scott bring this pro se civil-rights action under 42 U.S.C. § 1983, claiming that their rights under the Eighth Amendment and the Americans with Disabilities Act (ADA) were violated when administrators and staff at Warm Springs Correctional Center (WSCC) were indifferent to the threat that the coronavirus posed to the plaintiffs' health and failed to provide adequate medical care when the plaintiffs contracted COVID-19.[1]  Plaintiffs seek to bring a class action, and they move for leave to file a complaint that exceeds the 30-page limit by 13 pages.[2]

I now screen the complaint under 28 U.S.C. § 1915A.  Having done so, I dismiss all plaintiffs from this action without prejudice except Elliott.  I deny the motion for excess pages because Elliott can plead his claims within the 30-page limit.  And I dismiss the complaint with leave to file a first amended complaint by January 12, 2024.  Although each plaintiff is free to pursue his claims, only Elliott is permitted to proceed in this action currently.

---

[1] ECF No. 1-1.

[2] ECF No. 1-2.

1                                           **Background**

2   **A.      Factual allegations[3]**

3           The State of Nevada declared a "State of Emergency" in March 2020 due to the global

4   coronavirus pandemic.  "[T]he Center for Disease Control [(CDC)] issued protocols and

5   guidelines for state agencies and private businesses to follow to prevent, mitigate[,] and stop the

6   spread of the deadly virus."  The plaintiffs were housed at WSCC during the pandemic.  The

7   NDOC and prison administrators and staff were "mandated to follow the guidelines and

8   protocols issued by the CDC and the State of Nevada Dept. of Health and Safety."

9           At the beginning of the pandemic, WSCC administrators "did not alter the daily

10  operations of the prison" and continued under "normal conditions."  Prisoners were not

11  segregated, no "regular COVID-19 testing of inmates" was done, and no social distancing was

12  enforced.  Defendants issued the inmates cloth masks made from the same material as their

13  orange jumpsuits "to wear if they were housed in a segregation unit."  Hand sanitizer was issued

14  in small bottles but confiscated 24-hours later.  Cleaning happened under "normal conditions"

15  with "watered down" cleaning solutions and "performed at long intervals of time and not on a

16  regular basis."

17          Around the third week of September 2020, WSCC culinary "free-staff employee" Keith

18  reported that he was "sick" and staying home after he returned from an overseas trip.  Keith

19  returned to his job in the culinary hall about one or two weeks later.[4]  Keith was allowed to work

20  "without first providing a negative COVID-19 test result."

21  _____

22  [3] This is merely a summary of the allegations in the complaint, *see* ECF No.  1-1 at 12–42, and
    should not be construed as findings of fact.

23  [4] Plaintiffs allege that Keith returned to his post late September or early October 2022.  ECF
    No. 1-1 at 14.  Based on the entirety of the complaint, I assume this is a typo and that plaintiffs
    meant to write that Keith returned to work in 2020, not 2022.

After Keith returned, he worked with inmate Andrew Fowler in the culinary hall.  At this time there were "no reports of an inmate being sick or having symptoms."  Fowler was housed in unit 4-A.  Around October 11 or 12, Fowler reported that he was feeling sick—he "wasn't able to 'shake off' his fever" and complained of "body aches, loss of taste and smell, fatigue, and a raspy cough."

Medical staff removed Fowler from his position in the culinary hall and quarantined him in unit 4-B north.  After Fowler arrived, inmates who worked as porters, janitors, and laundry staff in 4-B north and south witnessed numerous other inmates from unit 4-A being placed in quarantine in 4-B north.  Six days after Fowler was given a COVID-19 test but before he received the results, Fowler was placed on an institutional-wide movement list and moved to unit 1 and housed with two or three other inmates in a four-man cell.  About 20 or 30 other inmates were moved to different housing units like Fowler was.

Four days after Fowler was moved to unit 1, he was interviewed by a man wearing a hazmat suit and told that he had tested positive for COVID-19.  Fowler was then transferred to Northern Nevada Correctional Center and his cellmates were moved to unit 2 and quarantined.  Despite these events, WSCC "remained open and operating under normal conditions."

The plaintiffs were housed in unit 4-B south during this time and saw COVID-19 spread through the housing unit and prison.  The plaintiffs contracted COVID-19 and experienced one or more of the following symptoms: fever, shortness of breath, difficulty breathing, headaches, blurred vision, lower back and abdominal pain, vomiting, diarrhea, loss of taste, smell, and appetite, delusions, vertigo, and loss of balance.  Medical staff responded by telling the plaintiffs to "drink lots of water[,]" offered them some cough drops and aspirin, and told them to "hang in there."  The plaintiffs did not see a doctor; WSCC didn't have one on staff at the time.

On November 5, 2022, the entire prison was placed in a quarantine lockdown, and the inmates were confined to their cells.  The plaintiffs were sick with COVID-19 and asked for "medical intervention and provision of any treatment," but none arrived.  Two days later, the plaintiffs saw a nurse who said her sole purpose was to take the inmates' vitals—temperature and oxygen levels.  Elliott "requested assistance" and pleaded for help," but the nurse responded: "sorry, there's nothing we can do, drink lots of water, hang in there."  Some inmates were "lucky to receive a few cough drops or aspirin."

Inmates were forced to request a "man down" to be examined by a nurse.  Inmates called "man down" when they had trouble breathing, but it would take 30–40 minutes before they received assistance.  The fire department and paramedics had to be called to open a cell door during a power failure.  The plaintiffs feared that they were being locked in their cells to die.

On November 25 and 26, Corrections Officers Lockman and Suey fumigated the plaintiffs' housing unit.  The lockdown was then modified, and the inmates were allowed to walk to the culinary hall for meals and be outside.  Around December 12 to 14, 2020, the NDOC transferred about 7–10 inmates to WSCC.  Upon arrival, the new inmates were told that they had tested positive for COVID-19.  Those inmates were quarantined in unit 4-B north.

On December 17, 2020, NDOC Director Charles Daniels gave a press conference in which he said that personal protective equipment (PPE), including hand sanitizer, was being provided to NDOC facilities.  But Correctional Officers Halling and Rynerson said that the PPE Daniels spoke about "did not exist" and wouldn't be handed out, and there were not enough N-95 masks to provide to inmates and staff.  Cleaning supplies continued to be "watered down and were insufficient to clean and sanitize the plaintiffs' housing unit.

1   The plaintiffs continued asking for "medical assistance and treatment."  They complained

2   about one or more of the following symptoms: shortness of breath, fatigue, dizziness, vertigo,

3   balance issues, vision problems, and pain in the kidney area.  Elliott filed a kite in November

4   2020 seeking medical attention for his symptoms, but he was not seen until January or February

5   2021.  Plaintiffs did not receive any diagnostic lab exams because the "medical review panel

6   would deny the submission" and staff believed the symptoms "needed to be 'worked' out of the

7   body and would go away in time."  Medical staff prescribed over the counter aspirin and Tylenol

8   and said to drink lots of water.  Some inmates were given an inhaler to use without any

9   diagnostic X-rays to review any damage done to their lungs.  Plaintiffs were so discouraged that

10  they stopped asking for help.

11  **B.    Causes of action**

12  Based on these factual allegations, plaintiffs sue the State of Nevada, the Nevada

13  Department of Corrections, Charles Daniels, Kyle Olsen, I. Baca, M. Minev, WSCC

14  Administrative Staff, WSCC Corrections Officers, WSCC Medical Director, WSCC Director of

15  Nursing, Nursing Staff, and Utilization Review Panel.[5]  I liberally construe the complaint as

16  bringing claims based on three different theories of liability: (1) Eighth Amendment indifference

17  to COVID-19 condition at WSCC, (2) Eighth Amendment indifference to serious medical needs

18  about COVID-19 infection; and (3) discrimination under the ADA and the Rehabilitation Act

19  (RA).  Plaintiffs seek injunctive and monetary relief.[6]

20

21

22

23  [5] ECF No. 1-1 at 2–11.

    [6] *Id.* at 41–43.

1    **Discussion**

2    **A.    Screening standard**

3        Federal courts must conduct a preliminary screening in any case in which a prisoner

4    seeks redress from a governmental entity or an officer or employee of a governmental entity.[7]  In

5    its review, the court must identify any cognizable claims and dismiss any claims that are

6    frivolous or malicious, or that fail to state a claim upon which relief may be granted or seek

7    monetary relief from a defendant who is immune from such relief.[8]  All or part of the complaint

8    may be dismissed *sua sponte* if the prisoner's claims lack an arguable basis in law or fact.  This

9    includes claims based on legal conclusions that are untenable, like claims against defendants who

10   are immune from suit or claims of infringement of a legal interest that clearly does not exist, as

11   well as claims based on fanciful factual allegations or fantastic or delusional scenarios.[9]

12       Dismissal for failure to state a claim is proper only if it is clear that the plaintiff cannot

13   prove any set of facts in support of the claim that would entitle him or her to relief.[10]  In making

14   this determination, the court takes all allegations of material fact as true and construes them in

15   the light most favorable to the plaintiff.[11]  Allegations of a pro se complainant are held to less

16   stringent standards than formal pleadings drafted by lawyers,[12] but a plaintiff must provide more

17

18

---

19   [7] *See* 28 U.S.C. § 1915A(a).

20   [8] *See id.* at § 1915A(b)(1)(2).

21   [9] *See Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

22   [10] *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999).

     [11] *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996).

23   [12] *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (recognizing that pro se pleadings must be liberally construed).

than mere labels and conclusions.[13]  "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations."[14]  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[15]

**B.     All plaintiffs except Elliott are dismissed without prejudice from this action.**

Litigants who are not represented by counsel are called "pro se" parties, and they have the right to plead and conduct their own cases on their own behalf.[16]  But pro se litigants have no authority to represent anyone other than themselves.[17]  This means pro se litigants cannot seek to certify a case as a class action themselves; they must be represented by counsel to do so.[18]  But there is no right to appointed counsel in civil-rights actions, and "the court will appoint counsel for indigent civil litigants only in 'exceptional circumstances[,]'"[19] which do not exist here.[20]

---

[13] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[14] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[15] *Id.*

[16] 28 U.S.C. § 1654.

[17] *See, e.g.*, *Simon v. Hartford Life, Inc.*, 546 F.3d 661, 664–65 (9th Cir. 2008) (collecting cases and explaining that a non-attorney plaintiff cannot pursue claims on behalf of others in a representative capacity); *Cato v. United States*, 70 F.3d 1103, 1105 n.1 (9th Cir. 1995); *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987).

[18] *See Simon*, 546 F.3d at 665 (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (holding pro se prisoner may not bring a class action on behalf of fellow prisoners)).

[19] *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009).

[20] *See id.* (explaining that "a court must consider the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims pro se in light of the complexity of issues involved" in determining if exceptional circumstances exist).

Elliott is the only plaintiff who signed the complaint.[21]  He is also the only plaintiff who applied for *in forma pauperis* status.[22]  No plaintiff has paid the full $402 filing fee in lieu of applying for *in forma pauperis* status.  And plaintiffs are not represented by counsel.

Elliott cannot pursue claims on behalf of the other named plaintiffs, and none of the plaintiffs can pursue claims on behalf of a class of similarly situated persons.  I therefore dismiss all plaintiffs other than Elliott from this action without prejudice, and only Elliott is permitted to proceed in this action currently.  If any plaintiff other than Elliott wishes to pursue his claims, he must file a signed complaint with the court, under a new case number, and either pay the required filing fee or properly apply to proceed *in forma pauperis*.

**C.    The motion for excess pages is denied, and the complaint is dismissed.**

Elliott moves for leave to file a pro se civil-rights complaint that exceeds the 30-page limit by 13 pages, arguing that he needs more pages because he seeks to bring a class action.[23]  Elliott is proceeding pro se and cannot pursue claims on behalf of a class of plaintiffs, so his reason for excess pages is moot.  And having reviewed the complaint, I find that Elliott does not require excess pages to plead his claims.  For example, Elliott can identify the relevant parties in less than the ten pages currently devoted to that purpose.[24]  And he can eliminate repetitive allegations like the two pages devoted to "facts common to all causes of action," which contains information that is pled elsewhere in the complaint.[25]

---

[21] ECF No. 1-1 at 43.

[22] ECF Nos. 1, 3.

[23] ECF No. 1-2.

[24] *See* ECF No. 1-1 at 2–11.

[25] *See id.* at 21–22.

I therefore deny the motion for excess pages and dismiss the oversized complaint with leave to file a first amended complaint that complies with the 30-page limit.  And I provide the following analysis to help guide Elliott toward filing a first amended complaint that complies with the pleading requirements for his claims.

**D.    Analysis of claims**

**1.    *State of Nevada and NDOC are not proper defendants for constitutional claims.***

"States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes are not 'persons' under § 1983."[26]  The NDOC is an agency of the State of Nevada that enjoys Eleventh Amendment immunity.[27]  The State of Nevada and the NDOC are not proper defendants for constitutional claims because neither entity is a "person" for § 1983's purposes.  If Elliott elects to file a first amended complaint, he should not assert his constitutional claims against the State of Nevada or the NDOC.

**2.    *Elliott fails to state an Eighth Amendment medical-indifference claim.***

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'"[28]  A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate.[29]  "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious

---

[26] *Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989)).

[27] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (concluding that the NDOC's predecessor, "[t]he Nevada Department of Prisons, as a state agency, [was] clearly immune from suit under the Eleventh Amendment"); *Snow v. McDaniel*, 681 F.3d 978, 990–91 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014).

[28] *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

[29] *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).

enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."[30]

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."[31]  To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."[32]  "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."[33]  When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury.[34]

Elliott fails to state a colorable Eighth Amendment claim based on indifference to serious medical needs.  He alleges that he contracted COVID-19 in October or November 2020 and suffered symptoms.  Although the complaint lists numerous symptoms that the *plaintiffs* suffered, it is not clear which symptoms *Elliott* experienced, how severe his symptoms were, and how long they lasted.

Elliott was not seen by a doctor.  But his temperature and oxygen levels were routinely monitored by medical staff.  Inmates who declared "man down" were examined by a nurse.  Sick inmates were provided aspirin, Tylenol, and cough drops to treat their symptoms and told to

---

[30] *Snow*, 681 F.3d at 985.

[31] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

[32] *Id.*

[33] *Id.*

[34] *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

drink lots of water.  Inmates with breathing problems were provided inhalers.  It isn't clear from the allegations if Elliott declared "man down" or experienced breathing problems.  Although Elliott's symptoms persisted and he filed grievances about them, the Utilization Review Panel did not approve him for further testing, and medical staff chose to follow a wait-and-see approach for his continuing symptoms.  But it is not clear from the allegations what symptoms Elliott continued to experience, their severity, or how long he experienced them.

These allegations fail to plausibly state that either Elliott's COVID-19 infection or his continuing symptoms were sufficiently serious for Eighth Amendment purposes.  The allegations also fail to state that anyone was indifferent to Elliott's medical needs.  It appears that Elliott's condition was monitored by medical staff.  Sick inmates received over-the-counter medications and inhalers to treat their symptoms.  Elliott does not identify what treatment he received, let alone what treatment he reasonably should have received.  And the thin factual allegations do not plausibly suggest that the course of treatment medical staff chose, including the wait-and-see approach for Elliott's continuing symptoms, was "medically unacceptable under the circumstances."[35]

If Elliott elects to file a first amended complaint and attempts to replead this claim, he should allege true facts about his COVID-19 infection and continuing symptoms to show that either was objectively serious.  And he should allege true facts about any act or omission that was "sufficiently harmful" to show deliberate indifference to his serious medical needs.[36]

---

[35] *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta*, 744 F.3d 1076, (explaining that, to establish that a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "they chose this course in conscious disregard of an excessive risk to [the prisoner's] health").

[36] *See Estelle*, 429 U.S. at 106.

### 3.     Elliott arguably states an Eighth Amendment conditions claim.

The "treatment a prisoner receives in prison and the conditions under which [he or she] is confined are subject to scrutiny under the Eighth Amendment."[37]  Conditions of confinement may, consistent with the Constitution, be restrictive and harsh.[38]  But under the Eighth Amendment, "'prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.'"[39]  "The Amendment's protections extend to 'conditions of confinement that are sure or very likely to cause serious illness and needless suffering' in the future."[40]  For example, "involuntarily exposing an inmate to secondhand tobacco smoke" or "'infectious maladies' [like] hepatitis" "can form the basis of an Eighth Amendment claim."[41]

"To establish an Eighth Amendment violation, a prisoner must satisfy both the objective and subjective components of a two-part test."[42]  In determining whether the alleged condition satisfies the objective prong of the Eighth Amendment analysis, the court must analyze each condition separately to verify if it violates the Eighth Amendment.[43]  "[T]he deprivation alleged must be, objectively, sufficiently serious" and "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."[44]  "The circumstances, nature,

---

[37] *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

[38] *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

[39] *Hampton v. Cal.*, 83 F.4th 754, 766 (9th Cir. 2023) (quoting *Farmer*, 511 U.S. at 832).

[40] *Id.* (cleaned up) (quoting *Helling*, 509 U.S. at 33–35).

[41] *Id.* (quoting *Helling*, 509 U.S. at 33).

[42] *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (cleaned up).

[43] *See Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981).

[44] *Farmer*, 511 U.S. at 834 (cleaned up).

and duration of a deprivation of these [basic] necessities must be considered in determining whether a constitutional violation has occurred."[45]

To satisfy the subjective prong of the Eighth Amendment analysis, a prisoner must show that a prison official acted with "deliberate indifference to inmate health or safety."[46]  To adequately plead deliberate indifference, a prisoner must show that a prison official was subjectively reckless.[47]  This entails showing that the prison "'official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he or she] must also draw the inference.'"[48]  "Constructive notice does not suffice to provide the requisite knowledge, but '[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including from circumstantial evidence.'"[49]

Elliott arguably states a colorable Eighth Amendment claim about indifference to the COVID-19 condition at WSCC.  He alleges that safety measures were mandated by the CDC and the State of Nevada to stop the coronavirus from spreading and thus protect people from contracting COVID-19.  Mandated safety measures included social-distancing, quarantining people infected with the coronavirus, and sanitizing surfaces and air.  These allegations are enough to state for screening purposes that a "societal consensus" arose in 2020 that "the risk of

---

[45] *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000); *accord Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).

[46] *Farmer*, 511 U.S. at 834.

[47] *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).

[48] *Id.* (quoting *Farmer*, 511 U.S. at 837).

[49] *Id.* (quoting *Farmer*, 511 U.S. at 841–42).

contracting COVID-19" "was 'intolerably grave' such that involuntarily exposing inmates to the disease violated then-current standards of decency."[50]  So the objective component of the Eighth Amendment analysis is satisfied for screening purposes.

As for the indifference prong, Elliott alleges that, after the mandates were issued, prison officials did not alter WSCC's operating procedures.  Cleaning procedures did not increase, and inmates were provided hand sanitizer for only one day.  NDOC Director Charles Daniels announced that PPE like masks and hand sanitizer would be available at NDOC facilities.  But the promised PPE supplies were not available at WSCC.

Officials did not require a symptomatic employee who had recently been overseas to provide a negative test when he returned to work after being ill.  When an inmate who worked with that employee in the culinary hall became ill, prison officials moved the inmate to a housing unit connected to Elliott's but did not effectively quarantine the inmate.  Elliott contracted COVID-19 and suffered symptoms as a result.

Elliott alleges that Kyle Olsen and I. Baca were WSCC's wardens during the pandemic, aware of safety protocols that had been mandated by the CDC and the State of Nevada, and responsible for enforcing those measures at WSCC.  Olsen and Baca were aware that the safety protocols were not being followed at WSCC—and inmates were becoming infected—because inmates and their family members filed complaints and grievances and staff members, including medical staff, issued them reports.

---

[50] *See Hampton*, 83 F.4th at 766 (finding allegations about community and governmental response were enough to show that a societal consensus "had emerged by May 2020" about the grave risk of COVID-19 exposure) (quoting *Hines v. Youseff*, 914 F.3d 1218, 1232 (9th Cir. 2019)).

1    These allegations arguably establish that Olsen and Baca did not take reasonable

2  measures to protect inmates at WSCC from contracting COVID-19.  So the deliberate-

3  indifference prong of the Eighth Amendment analysis is satisfied as to those defendants for

4  screening purposes.  But this claim cannot proceed because I have dismissed the complaint for

5  being oversized.  So if Elliott wishes to proceed with this claim, he must file an amended

6  complaint and reallege it.

7         **4.    *Elliott fails to state a discrimination claim under the ADA or RA.***

8    Both the ADA and the RA apply in the prison context.[51]  The ADA provides that "no

9  qualified individual with a disability shall, by reason of such disability, be excluded from

10 participation in or be denied the benefits of the services, programs, or activities of a public entity,

11 or be subjected to discrimination by any such entity."[52]  The RA similarly states that "[n]o

12 otherwise qualified individual with a disability in the United States . . . shall, solely by reason of

13 her or his disability, be excluded from the participation in, be denied the benefits of, or be

14 subjected to discrimination under any program or activity receiving Federal financial

15 assistance."[53]  The ADA applies only to public entities," like any State, local government, or

16 their entities, "whereas the RA proscribes discrimination in all federally funded programs."[54]  A

17 prisoner states a colorable claim under both the ADA and RA if he alleges that he was

18

19

20

---

21 [51] *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010).

22 [52] 42 U.S.C. § 12132.

   [53] 29 U.S.C. § 794(a).

23 [54] *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (cleaned up); *accord* 42 U.S.C.
   § 12131(1) (defining "public entity").

1  "improperly excluded from participation in, and denied the benefits of, a prison service,
2  program, or activity on the basis of his physical handicap."[55]

3      Although the ADA does not expressly provide for reasonable accommodations, the
4  implementing regulations provide that "[a] public entity shall make reasonable modifications in
5  policies, practices, or procedures when the modifications are necessary to avoid discrimination
6  on the basis of disability, unless the public entity can demonstrate that making the modifications
7  would fundamentally alter the nature of the service, program, or activity."[56]  The Supreme Court
8  has held that a prisoner may state an ADA claim based on the "alleged deliberate refusal of
9  prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as
10  mobility, hygiene, medical care, and virtually all other prison programs."[57]  Courts apply the
11  same analysis to claims brought under the ADA and RA.[58]

12      But a plaintiff cannot proceed against a prison official in his or her individual capacity on
13  a claim under § 1983 based on the official's "alleged violation of Title II of the ADA and section
14  504 of the [RA]."[59]  Thus, the proper defendant in an action under the ADA or RA is a prison
15  official in his or her official capacity[60] or the public entity responsible for the alleged
16  discrimination, which could include an agency of the State of Nevada like the NDOC.[61]

17

18

---

[55] *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

[56] 28 C.F.R. § 35.130(b)(7).

[57] *United States v. Georgia*, 546 U.S. 151, 157 (2006).

[58] *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

[59] *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).

[60] "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71).

[61] *See United States v. Georgia*, 546 U.S. 151, 153–54 (2006).

1    Elliott does not state a colorable claim under the ADA or RA.  Elliott has not alleged

2    enough facts to plausibly state that his COVID-19 infection is a disability under the ADA or RA.

3    Disability means (1) "a physical or mental impairment that substantially limits one or more

4    major life activities of" the individual, (2) "a record of such an impairment[,]" or (3) "being

5    regarded as having such an impairment."[62]  Elliott also has not alleged facts that he was either

6    excluded from participation in or denied the benefits of the prison's services, programs, or

7    activities because of his COVID-19 infection.  Elliott instead contends that prison officials failed

8    to adequately treat his COVID-19 infection.  But "[t]he ADA prohibits discrimination because of

9    disability, not inadequate treatment for disability.'"[63]

10    If Elliott elects to file a first amended complaint and attempts to replead this claim, he

11    should allege true facts about his COVID-19 infection and continuing symptoms to show that it

12    constitutes a disability for the ADA and RA's purposes.  Elliott should also allege true facts to

13    show that he was denied the benefit of some prison service, activity, or program because of his

14    COVID-19 infection, not simply that prison staff failed to adequately treat his infection.

15    **E.    Leave to amend**

16    If Elliott chooses to file an amended complaint, he is advised that an amended complaint

17    replaces the original complaint, so it must be complete in itself.[64]  This means that Elliott's

18    amended complaint must contain all claims, defendants, and factual allegations that he wishes to

19    pursue in this lawsuit.  Elliott must file the amended complaint on this court's approved prisoner-

20

---

21    [62] *See* 42 U.S.C. § 12102(1).

22    [63] *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

23    [64] *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989).

civil-rights form, and it must be titled "First Amended Complaint."  He must follow the instructions on the form.  He need not and should not allege very many facts in the "nature of the case" section of the form.  Rather, in each claim, Elliott should allege <u>facts</u> sufficient to show what <u>each</u> defendant did to violate his civil rights.  **And he must file the amended complaint by January 12, 2024**.

### Conclusion

IT IS THEREFORE ORDERED that a decision on Elliott's application to proceed *in forma pauperis* (ECF Nos. 1, 3) is DEFERRED.

IT IS FURTHER ORDERED that the motion for excess pages **(ECF No. 1-2) is DENIED.**

IT IS FURTHER ORDERED that **the complaint (ECF No. 1-1) is DISMISSED without prejudice and with leave to amend by January 12, 2024.**

IT IS FURTHER ORDERED that the claims of **plaintiffs Samisoni Taukitoko, Bradley Sandefur, Cody Braese, Bradley Carver, Demian Dominguez, Andrew Fowler, Billie Ross, and Samuel Scott are DISMISSED** without prejudice from this action.  If any of these plaintiffs wishes to proceed with his claims, <u>each</u> inmate must file <u>his own</u> complaint with the court, under a <u>new</u> case number, and either pay the full $402 filing fee or file a fully complete application to proceed *in forma pauperis*.  **The Clerk of the Court is directed to SEND** Samisoni Taukitoko, Bradley Sandefur, Cody Braese, Bradley Carver, Demian Dominguez, Andrew Fowler, Billie Ross, and Samuel Scott **<u>each</u>** the approved form for filing a 42 U.S.C. 1983 complaint, instructions for the same, a copy of the original complaint (ECF No. 1-1), and the approved form application to proceed *in forma pauperis* for an inmate and instructions for the same.

IT IS FURTHER ORDERED that all defendants are DISMISSED without prejudice from this action.

IT IS FURTHER ORDERED that **the Clerk of the Court is directed to FILE the complaint (ECF No. 1-1) and SEND** plaintiff Robert Elliott the approved form for filing a § 1983 prisoner complaint, instructions for the same, and a copy of the original complaint (ECF No. 1-1).

IT IS FURTHER ORDERED that plaintiff Robert Elliott has **until January 12, 2024,** to FILE a first amended complaint.  If Elliott chooses to file an amended complaint, he must use the court's approved form and title it "First Amended Complaint."  The amended complaint will be screened in a separate screening order, and **the screening process will take <u>many months</u>.  If Elliott does not file an amended complaint by January 12, 2024, this action will be subject to dismissal without prejudice for failure to follow a court order.**

Dated: December 12, 2023

_____
U.S. District Judge