# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Robert Elliott,

      Plaintiff

v.

State of Nevada, et al.,

      Defendants

Case No.: 2:23-cv-00680-JAD-NJK

**Order Screening First Amended Complaint and Resolving Motions**

[ECF Nos. 10, 11, 12, 13]

Plaintiff Robert Elliott brings this pro se civil-rights action under 42 U.S.C. § 1983, alleging that his federal rights were violated while he was incarcerated at Warm Springs Correctional Center (WSCC).[1] Elliott has filed a complete application to proceed *in forma pauperis*.[2] Because his original complaint was deficient on several grounds, I dismissed it with leave for him to file a first amended complaint by March 12, 2024.[3] Elliott timely filed his first amended complaint (FAC),[4] and I now screen it under 28 U.S.C. § 1915A.

Having done so, I find that Elliott states a colorable Eighth Amendment claim about indifference to the coronavirus condition at WSCC, so that claim may proceed. But I dismiss his medical-indifference and disability-discrimination claims without leave to amend. I dismiss Elliott's religious-exercise claims without leave to amend in this action because they are not

---

[1] ECF No. 5.

[2] ECF Nos. 1, 3.

[3] ECF Nos. 4, 7.

[4] ECF No. 9.

properly joined with his conditions claim.  And I deny Elliott's motions seeking free file-stamped copies of all documents that he's filed in this action.[5]

**Background**

**A.    Elliott's factual allegations[6]**

Elliott was incarcerated at WSCC from at least March 2020 until December 20, 2022. Around March 2020 the State of Nevada declared an emergency to address the coronavirus pandemic.  The Centers for Disease Control (CDC) issued protocols and guidelines for state agencies and private businesses to follow to prevent the spread of the coronavirus.  Despite these guidelines and protocols, prison officials continued to operate WSCC "under normal conditions" for several months.  Normal conditions means that sick inmates were not segregated, social distancing was not enforced, inmates were not regularly tested for COVID-19, prison programming and services continued, and cleaning happened with watered-down solutions and on an infrequent basis.

Inmates were provided a cloth mask to wear if they were in segregated housing and given small bottles of hand sanitizer that were confiscated the next day.  In the third week of September 2020, free culinary employee Kieth reported that he was sick and staying home after he returned from an overseas trip.  Despite Kieth's illness, the prison continued to operate under "normal conditions."  Kieth returned to work about two weeks later.  Prison officials did not require Kieth to provide a negative COVID-19 test before allowing him to return.  At this time, there were no reports that any inmate had COVID-19 symptoms.

---

[5] ECF Nos. 10, 11, 12, 13.

[6] This is merely a summary of the allegations in the FAC, *see* ECF No. 9 at 2–27, and should not be construed as findings of fact.

But inmate Fowler, who worked in the culinary department, soon reported to medical staff that he was sick, unable to "shake off" his fever, and had body aches, loss of taste and smell, fatigue, and a raspy cough. Prison staff removed Fowler from his job and placed him in quarantine in unit 4-B north. Fowler had contact with other inmates and staff while he was in quarantine.

General population inmates who lived in unit 4-B south, which is connected to unit 4-B north, are employed as porters, janitors, culinary staff, and laundry workers. Elliott resided in unit 4-B south and was employed as a porter and religious facilitator. Fowler was given a COVID-19 test and told to await the results. Before Fowler received the results, he was placed on an institution-wide "movement" list, relocated to a different unit in the general population, and placed in a cell with two or three other inmates. Approximately 20–30 inmates were required to switch housing because of this list.

About four days after Fowler was moved, he was informed by a man in a Hazmat suit that he had tested positive for COVID-19. Fowler was then transferred to Northern Nevada Correctional Center, and his cellmates were transferred to a different unit and placed in quarantine. Despite Fowler's positive COVID-19 test, the prison continued operating under "normal conditions." This means people entering the prison were subjected only to a temperature test and question of whether they were experiencing "flu-like symptoms." COVID-19 rapid tests were not used to verify whether employees were infected.

Soon other inmates in unit 4-B south experienced COVID-19 symptoms, and the entire prison was placed in a quarantine on November 5, 2020. But Elliott contracted the coronavirus on October 30, 2020, reporting to prison staff that he had a fever, cold sweat, dizziness, and

1  fatigue.  Medical staff ordered Elliott to return to his housing unit, monitor his symptoms, and

2  drink lots of water.

3      Elliott's fever rose and he experienced blurred vision, lower back and abdominal pain,

4  delusions, and headaches, and he was unable to eat or drink due to vomiting and diarrhea.  These

5  symptoms forced Elliott to remain in his bed.  When he was unable to attend meals, his cellmate

6  reported his condition to prison staff.  Corrections officers then came to Elliott's cell and asked,

7  "Are you alive, Elliott?"  Elliott replied, "barely," and the officers walked away chuckling.

8      Elliott did not see a medical provider until six days after his symptoms began.  On

9  November 6, 2020, a nurse came to Elliott's housing unit to check the inmates' vitals and oxygen

10 levels.  Elliott's oxygen level was "low," and Elliott complained to the nurse it was hard to

11 breathe.  The nurse gave Elliott a COVID-19 test, stated there was nothing more she could do,

12 and instructed Elliott to drink lots of water.  Elliott said that he couldn't keep anything down and

13 that his urine was a deep orange, but the nurse "had walked away to the next cell."

14     Five days later, Elliott declared a man-down medical emergency due to extreme

15 breathing difficulty.  Corrections officers said that medical staff was coming, but then the

16 prison's power failed and corrections officers were unable to open Elliott's cell door.

17 Emergency personnel arrived at the prison but responded to a different inmate's man-down

18 request for emergency care.  Terrified, Elliott started to plan with his cellmate in the event he

19 died in his cell.

20     Elliott was particularly worried because he was diagnosed with pituitary cancer in 2009

21 after he suffered a "T.I.A." at Ely State Prison.  This condition causes Elliott to suffer migraine

22 headaches, tremors and seizures, vision impairment, and endocrine issues.  Elliott also has

23 PTSD. and anxiety.  Medical staff who monitored Elliott's cancer condition were the same staff

1 who monitored his oxygen levels and told him to drink lots of water for his COVID-19

2 symptoms.

3       Elliott's COVID-19 symptoms started to "break" on November 15, 2020. But he soon

4 reported to medical staff that he was having kidney pain and difficulty breathing while lying

5 down. Elliott declared a man-down emergency on November 22 or 23 and was escorted to the

6 medical building about 20 or 30 minutes later. Elliott's oxygen level was 76, his temperature

7 was 96 degrees, and his blood pressure was 110/171. Elliott was given "an inhalation treatment"

8 and cough drops and sent back to his unit. Elliott asked to be scheduled for tests about his

9 breathing issues, but the nurse denied the request stating, "the medical panel has already denied

10 all exams; drink lots of water, it will work itself out of your system." Elliott then asked for tests

11 about his kidney pain, but the nurse replied, "that's why you need to drink more water."

12       Elliott was finally examined by a doctor on December 7, 2020, and given a urine test.

13 The test revealed that Elliott had a urinary infection, so he was given antibiotics and told to drink

14 lots of water. When Elliott asked for testing about his kidneys and breathing issues, medical

15 staff said if Elliott's condition "was really bad [he] wouldn't be walking." Elliott was given an

16 inhaler for any emergencies and escorted back to his housing unit.

17       Elliott submitted kites complaining about breathing issues, kidney pain, that his tremors

18 had increased in force and frequency, and he was having "mental-health issues/trauma." Elliott

19 complained to nurses when he saw them passing by that he got winded just walking, and they

20 responded, "hang in there you'll be ok." Elliott was then given an inhaler to help in his "daily"

21 routines. Elliott did not receive further testing.

22       Elliott's grievances about the need for testing were responded to with statements that he

23 needed to contact medical for his medical needs or repeated X-rays were not advisable. Mental-

health providers told Elliott he needed to try relaxing, not to panic, perform breathing exercises, and meditate.

The prison-wide quarantine ended around November 25, 2020.  Prisoners were allowed to access the exercise yard.  Housing units were separated for meal service and education classes. Inmates were again transferred between the facilities.  But religious services and programs remained cancelled based on orders from the Governor and Nevada Department of Corrections (NDOC) Medical Director Minev.  In December 2020 NDOC Director Charles Daniels gave a State of Nevada report to news media, claiming that prisoners were receiving personal protective equipment (PPE), but his claims proved false.

After the quarantine ended, Elliott tried to re-enroll in his computer-education course but was denied because he reported ongoing COVID-19 symptoms.  Elliott's mother died from COVID-19 in September 2021.  Elliott is a Native American of Apache heritage on his mother's side.  Elliott asked the acting chaplain, Lieutenant Fonoimoana, for permission to perform a pipe ceremony required by his religious beliefs.  Fonoimoana said that Assistant Warden K. Widmar needed to approve the request.  Elliott sent requests to Widmar but didn't receive a response.

Elliott filed a grievance to obtain access to the religious grounds to perform necessary rituals in October 2021.  Widmar returned the grievance for procedural defects but delayed doing so.  Elliott refiled the grievance and eventually met with acting chaplain Lieutenant Tolotti to resolve the issue.  In March 2022, Elliott and selected members of the Native American religious group were given access to the religious grounds and the "Inipi" to perform a pipe ceremony for Elliott's mother.

**B.    Elliott's causes of action**

Based on these allegations, Elliott sues Charles Daniels, K. Olsen, I. Bacca, M. Minev, and numerous Doe defendants.[7]  I liberally construe the FAC as bringing claims based on four different theories of liability: (1) an Eighth Amendment claim for deliberate indifference to serious medical needs, (2) an Eighth Amendment claim for deliberate indifference to unsafe prison conditions, (3) a disability-discrimination claim under the Americans with Disabilities Act of 1990 (ADA)[8] and the Rehabilitation Act of 1973 (RA),[9] and (4) a burdening-religious-exercise claim under the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA).  Elliott seeks monetary, injunctive, and declaratory relief.[10]

**Discussion**

**A.    Screening standard**

Federal courts must conduct a preliminary screening in any case in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity.[11]  In its review, the court must identify any cognizable claims and dismiss any claims that are frivolous or malicious, or that fail to state a claim upon which relief may be granted or seek monetary relief from a defendant who is immune from such relief.[12]  All or part of the complaint

---

[7] ECF No. 9 at 1–3.  To the extent Elliott seeks to bring claims against the State of Nevada or the NDOC, *see id.* at 20, those defendants are dismissed with prejudice from this action for reasons explained in the December 12, 2023, screening order.  ECF No. 4 at 9.

[8] 42 U.S.C. §§ 12101 et seq.

[9] 29 U.S.C. §§ 701 et seq.

[10] ECF No. 9 at 30–31.

[11] *See* 28 U.S.C. § 1915A(a).

[12] *See id.* at § 1915A(b)(1)(2).

may be dismissed *sua sponte* if the prisoner's claims lack an arguable basis in law or fact. This includes claims based on legal conclusions that are untenable, like claims against defendants who are immune from suit or claims of infringement of a legal interest that clearly does not exist, as well as claims based on fanciful factual allegations or fantastic or delusional scenarios.[13]

Dismissal for failure to state a claim is proper only if it is clear that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief.[14] In making this determination, the court takes all allegations of material fact as true and construes them in the light most favorable to the plaintiff.[15] Allegations of a pro se complainant are held to less stringent standards than formal pleadings drafted by lawyers,[16] but a plaintiff must provide more than mere labels and conclusions.[17] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[18] "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[19]

---

[13] *See Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989), *superseded on other grounds by* 28 U.S.C. § 1915(e); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

[14] *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999).

[15] *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996).

[16] *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (recognizing that pro se pleadings must be liberally construed).

[17] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[18] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[19] *Id.*

**B.    Analysis of claims**

      **1.    *Elliott fails to state an Eighth Amendment medical-indifference claim.***

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . .'"[20] A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of a prisoner.[21] "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."[22]

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."[23] "Serious medical needs can relate to physical, dental[,] and mental health."[24] To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."[25] Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."[26]

---

[20] *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

[21] *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

[22] *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014).

[23] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

[24] *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (cleaned up).

[25] *Id.*

[26] *Id.*

Elliott fails to state a colorable Eighth Amendment claim about indifference to his serious medical needs. In the FAC, he alleges four deprivations: (1) inadequate treatment for acute COVID-19 infection, (2) inadequate diagnosis of urinary infection, (3) inadequate testing for long COVID-19 infection, and (4) inadequate treatment for mental-health conditions. Elliott alleges that he contracted coronavirus in October 2020, suffered symptoms, and his symptoms started to "break" about 15 days later. Elliott was repeatedly seen by medical staff during this time and his vitals and oxygen levels were monitored. He was told to drink lots of water. When Elliott's symptoms worsened, he was given an inhalation treatment, cough drops, and inhalers to use for emergencies.

The allegations arguably state that Elliott's COVID-19 infection constituted a serious medical need. But this detailed narrative belies the notion that any person ignored Elliott's COVID-19 infection. And even generously construed, the allegations fail to plausibly state that the course of treatment medical staff chose for that condition was "medically unacceptable under the circumstances" and that each defendant "chose this course in conscious disregard of an excessive risk to [Elliott's] health."[27] The allegations thus fail to plausibly state that any person was indifferent to Elliott's acute COVID-19 infection.

When Elliot's kidney/abdominal pain persisted, he was given a urine test and antibiotics to treat the infection it detected. At best, the allegations state that prison staff was negligent in diagnosing Elliott's urinary infection. But "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation

---

[27] *See Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

merely because the victim is a prisoner."[28]  And even gross negligence is insufficient to establish

deliberate indifference to serious medical needs.[29]  The allegations thus fail to state that any

person was indifferent to Elliott's urinary infection.

Elliott alleges that when his COVID-19 symptoms persisted, he was given inhalers to use

in daily activities but denied further testing like X-rays.  A nurse told Elliott that the medical

panel decided there would be no further testing, and a grievance responder told Elliott that

repeated chest X-rays were ill-advised because of the risks from the testing.  "At some point

'wait and see' becomes deny and delay."[30]  But it is not clear from the allegations which of

Elliott's COVID-19 symptoms persisted, for how long, and whether any delay providing testing

or treatment has caused Elliott injury.  His allegations thus fail to plausibly state that he had a

serious medical need to be monitored with chest X-rays.  And there are no factual allegations

that any person was aware of Elliott's need for that monitoring and purposefully acted or failed

to respond to that need.  The allegations thus fail to satisfy either prong of the Eighth

Amendment analysis for the long COVID-19 infection.

Elliott also alleges that he experienced terror and anxiety because of the coronavirus

pandemic and his infection.  When Elliott reported his condition, the mental-health provider told

him to relax and try breathing and meditation exercises.  But there are no factual allegations that

any person ignored Elliott's need for a mental-health evaluation.  And the few well-pled facts fail

to plausibly state that the course of treatment medical staff chose was "medically unacceptable

under the circumstances" and that each defendant "chose this course in conscious disregard of an

---

[28] *Estelle*, 429 U.S. at 106.

[29] *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

[30] *Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022).

excessive risk to [Elliott's] health."[31]  The allegations thus fail to plausibly state that any person was indifferent to Elliott's mental-health needs.

This is Elliott's second attempt to state a claim about indifference to his medical needs and he has failed to do so.  It does not appear that Elliott can state additional facts to support the missing elements for any of the alleged deprivations at this stage of the proceeding.  The Eighth Amendment medical-indifference claims are therefore dismissed without prejudice and without leave to amend currently.

### 2.    *Elliott arguably states an Eighth Amendment prison-conditions claim.*

The "treatment a prisoner receives in prison and the conditions under which [he or she] is confined are subject to scrutiny under the Eighth Amendment."[32]  Conditions of confinement may, consistent with the Constitution, be restrictive and harsh.[33]  But under the Eighth Amendment, "'prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.'"[34]  "The Amendment's protections extend to 'conditions of confinement that are sure or very likely to cause serious illness and needless suffering' in the future."[35]  For example, "involuntarily exposing an inmate to secondhand tobacco smoke" or "'infectious maladies' [like] hepatitis" "can form the basis of an Eighth Amendment claim."[36]

---

[31] *See Hamby*, 821 F.3d at 1092.

[32] *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

[33] *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

[34] *Hampton v. Cal.*, 83 F.4th 754, 766 (9th Cir. 2023) (quoting *Farmer*, 511 U.S. at 832).

[35] *Id.* (cleaned up) (quoting *Helling*, 509 U.S. at 33–35).

[36] *Id.* (quoting *Helling*, 509 U.S. at 33).

1    "To establish an Eighth Amendment violation, a prisoner must satisfy both the objective

2  and subjective components of a two-part test."[37]  In determining whether the alleged condition

3  satisfies the objective prong of the Eighth Amendment analysis, the court must analyze each

4  condition separately to verify if it violates the Eighth Amendment.[38]  "[T]he deprivation alleged

5  must be, objectively, sufficiently serious" and "a prison official's act or omission must result in

6  the denial of the minimal civilized measure of life's necessities."[39]  "The circumstances, nature,

7  and duration of a deprivation of these [basic] necessities must be considered in determining

8  whether a constitutional violation has occurred."[40]

9         To satisfy the subjective prong of the Eighth Amendment analysis, a prisoner must show

10  that a prison official acted with "deliberate indifference to inmate health or safety."[41]  To

11  adequately plead deliberate indifference, a prisoner must show that a prison official was

12  subjectively reckless.[42]  This entails showing that the prison "'official kn[ew] of and

13  disregard[ed] an excessive risk to inmate health or safety; the official must be both aware of facts

14  from which the inference could be drawn that a substantial risk of serious harm exists, and [he or

15  she] must also draw the inference.'"[43]  "Constructive notice does not suffice to provide the

16  requisite knowledge, but '[w]hether a prison official had the requisite knowledge of a substantial

17

18

---

19  [37] *Toguchi*, 391 F.3d at 1057 (cleaned up).

20  [38] *See Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981).

    [39] *Farmer*, 511 U.S. at 834 (cleaned up).

21  [40] *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000); *accord Hearns v. Terhune*, 413 F.3d
    1036, 1042 (9th Cir. 2005).

22  [41] *Farmer*, 511 U.S. at 834.

23  [42] *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).

    [43] *Id.* (quoting *Farmer*, 511 U.S. at 837).

1 | risk is a question of fact subject to demonstration in the usual ways, including from

2 | circumstantial evidence.'"[44]

3 |     Elliott arguably states a colorable Eighth Amendment claim about indifference to the

4 | COVID-19 condition at WSCC.  He alleges that safety measures were mandated by the CDC and

5 | the State of Nevada to stop the coronavirus from spreading and thus protect people from

6 | contracting COVID-19.  Mandated safety measures included social-distancing, quarantining

7 | people infected with the coronavirus, and sanitizing surfaces and air.  These allegations are

8 | enough to state for screening purposes that a "societal consensus" arose in 2020 that "the risk of

9 | contracting COVID-19" "was 'intolerably grave' such that involuntarily exposing inmates to the

10 | disease violated then-current standards of decency."[45]  So the objective component of the Eighth

11 | Amendment analysis is satisfied for screening purposes.

12 |     As for the indifference prong, Elliott alleges that after the mandates were issued, prison

13 | officials did not alter WSCC's operating procedures.  Cleaning procedures did not increase, and

14 | inmates were provided hand sanitizer for only one day.  NDOC Director Charles Daniels

15 | announced that PPE like masks and hand sanitizer would be available at NDOC facilities.  But

16 | the promised PPE supplies were not available at WSCC.

17 |     Officials did not require a symptomatic employee who had recently been overseas to

18 | provide a negative test when he returned to work after being ill.  When an inmate who worked

19 | with that employee in the culinary hall became ill, prison officials moved the inmate to a housing

---

[44] *Id.* (quoting *Farmer*, 511 U.S. at 841–42).

[45] *See Hampton*, 83 F.4th at 766 (finding allegations about community and governmental response were enough to show that a societal consensus "had emerged by May 2020" about the grave risk of COVID-19 exposure) (quoting *Hines v. Youseff*, 914 F.3d 1218, 1232 (9th Cir. 2019)).

unit connected to Elliott's but did not effectively quarantine the inmate. Elliott contracted COVID-19 and suffered symptoms as a result.

Generously construed, the FAC arguably states that K. Olsen and I. Bacca were WSCC's wardens during the pandemic, aware of safety protocols that had been mandated by the CDC and the State of Nevada, responsible for enforcing those measures at WSCC, and aware those measures were not being followed at WSCC. The allegations arguably state that Olsen and Bacca did not take reasonable measures to protect inmates at WSCC from contracting COVID-19. For instance, an inmate with COVID-19 symptoms was not properly quarantined and then moved to a cell with other inmates as part of an institution-wide transfer and before prison staff received the results of his COVID-19 test. The deliberate-indifference prong of the Eighth Amendment analysis is satisfied as to Olsen and Bacca for screening purposes. But there are no factual allegations that Daniels or Minev were aware that safety measures were not being followed at WSCC. The Eighth Amendment claim about indifference to coronavirus conditions may therefore proceed against Olsen and Bacca only.

### 3.    Elliott fails to state a discrimination claim under the ADA or RA.

A prisoner states a colorable claim under the ADA and RA if he alleges that he was "improperly excluded from participation in, and denied the benefits of, a prison service, program, or activity on the basis of his physical handicap."[46] Courts apply the same analysis to claims brought under the ADA and RA.[47] The ADA defines disability to mean either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded has having such an

---

[46] *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

[47] *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

impairment[.]"[48]  Being regarded as having an impairment that substantially limits a major life activity, however, does "not apply to impairments that are transitory and minor.  A transitory impairment is an impairment with  an actual or expected duration of 6 months or less."[49]

Elliott fails to state a colorable disability-discrimination claim because he does not plausibly allege that he was disabled for the ADA and RA's purposes.  Elliott alleges that when he sought to re-enroll in his computer course after the coronavirus quarantine ended at WSCC, he was told that he could not attend because he was still reporting COVID-19 symptoms.  But Elliott does not allege when the denial happened.  Based on the allegations, symptoms of Elliott's acute COVID-19 infection lasted about two weeks.  Elliott continued to suffer breathing difficulties and expressed concerns about "future damage" to his lungs.  But there are no factual allegations to support the implication that Elliott has lasting and substantial impairment of major life functions as a result of his COVID-19 infection.  For instance, Elliott does not state which symptoms continued, how severe they were, or how long they persisted.

This is Elliott's second attempt to state a disability discrimination claim under the ADA and RA about his COVID-19 infection, and he has failed to do so.  It does not appear that Elliott can state additional facts to support this claim's missing element at this stage of the proceeding.  Elliott's claims under the ADA and RA about disability discrimination are therefore dismissed without prejudice and without leave to amend currently.

### 4.  *Elliott's religious-rights claims are dismissed as improperly joined.*

A basic lawsuit is a single claim against a single defendant.  Federal Rule of Civil Procedure (FRCP) 18(a) allows a plaintiff to add multiple claims to the lawsuit when they are

---

[48] 42 U.S.C. § 12102(1).

[49] *Id.* at § 12102(3)(B).

against the same defendant.  FRCP 20(a)(2) allows a plaintiff to join multiple defendants to a lawsuit where the right to relief arises out of the same "transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action."  But unrelated claims that involve different defendants must be brought in separate lawsuits.[50]  This rule is not only intended to avoid confusion that arises out of bloated lawsuits, but also to ensure that inmates pay the required filing fees for their lawsuits and prevent inmates from circumventing the three strikes rule under the Prison Litigation Reform Act.[51]

In this suit, I am allowing an Eighth Amendment claim about indifference to coronavirus conditions to proceed against Olsen and Bacca.  But the FAC also contains claims under the First Amendment's Free Exercise Clause and RLUIPA, contending that Nevada's Governor, Minev, Fonoimoana, and Widmar burdened Elliott's religious exercises when they decided not to reopen religious grounds, services, and programs when they reopened other programs and services after ending the quarantine at WSCC.  The coronavirus pandemic is the backdrop for all claims in the FAC, but Elliott's religious-exercise claims arise out of the alleged decision to reopen some but not all of the prison's programs and services when the quarantine ended.  This decision is separate and distinct from the alleged series of acts and omissions of failing to adhere to established safety protocols that comprise Elliott's Eighth Amendment claim.

In short, Elliott cannot pursue his religious-exercise claims in the same action as his safety-indifference claim because those claims are not related and concern different groups of defendants.  The religious-exercise claims are therefore dismissed without prejudice and without

---

[50] *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (holding that "[a] buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner").

[51] 28 U.S.C. § 1915(g).

leave to amend in this action.  If Elliott wants to pursue claims under the First Amendment's

Free Exercise Clause or RLUIPA, he must file a separate complaint in a **new** action, under a **new**

case number, and either pay the required filing fee or apply for pauper status.

**C.    Motions for relief**

Elliott moves for an order directing the prison's law library to provide him free filed-

stamped copies of all documents that he's submitted for filing with the court, and for a decision

on that motion.[52]  Elliott states that when he submits documents for filing with the court, the

prison's law library returns his original documents along with a copy of the document's first

page bearing the court's file stamp.  Elliott argues this practice is contrary to the policy that

permits all attorneys and parties, including pro se litigants like him, to receive free copies of all

documents filed in an action.  Elliott also contends that his IFP application is missing pages and

disorganized.

Because Elliott is a prisoner, electronic filing procedures in this action are governed by

this court's Fifth Amended General Order 2012-01.  Under that filing order, Elliott is not entitled

to a free and complete file-stamped copy of documents that *he* submits for filing with the court.

Rather, the filing order provides that "[t]he original documents must be returned to the

prisoner."[53]  And NDOC staff must print and provide to prisoners the electronic transmission

receipt and any hyperlinked order or document that is filed *by the court or opposing parties*.[54]

The prison law library's procedure of returning original documents to prisoners plus a copy of

the document's first page showing the court's file stamp complies with the filing order.

---

[52] ECF Nos. 10, 11, 12, 13.

[53] Fifth Amended General Order 2012-01 at ¶ 5.

[54] *Id.* at ¶¶ 7, 8.

As for the daily transaction summaries that are missing or ill arranged in Elliott's IFP application, there is no prejudice. Daily transaction summaries are not the kinds of financial documents the court ordinarily considers when deciding whether to grant a prisoner IFP status.[55] Those documents will not be considered here because Elliott later filed the correct financial documents to support his IFP application—a completed financial certificate that is properly signed by the inmate and an authorized prison official and a copy of the inmate's trust fund account statement for the previous six-month period.[56] Elliott's motion for free file-stamped copies of documents that he submits for filing with the court is therefore denied.

This order moots Elliott's motions seeking a decision on his motion for free copies.[57] But I write separately about them because Elliott's habit of filing new motions that are, in substance, identical to motions he has already filed or filing motions seeking updates, oral argument, or a decision on pending motions will not increase the speed with which the court is able to proceed in this case. The court has a heavy docket, and Elliott's case is just one of hundreds of cases that are before it. Elliott's repetitive and borderline frivolous filings only *slow* the pace of this litigation (and everybody else's) by requiring the court's attention and consideration of small and secondary matters instead of the central issues in this case. The court has thus far been lenient because Elliott is a pro se litigant. But this status does not give him the right to clutter the docket. Elliott is warned that neither his status as a pro se nor an indigent litigant will dissuade the court from considering sanctions against him for filing groundless and duplicative motions.

---

[55] *See* 28 U.S.C. § 1915(a)(1)–(2); Nev. LSR 1-2.

[56] ECF No. 3.

[57] ECF Nos. 11, 12, 13.

Elliott expresses confusion about why no defendant responded to his motion seeking free copies.[58]  Although the court automatically set a deadline for filing responses when Elliott filed that motion, no defendant filed a response because no defendant has yet appeared in this action. And no defendant has appeared because the court has not yet ordered service upon any defendant.  As the court previously advised Elliott when he filed this action, "The [c]ourt will order service upon defendants when it is time to do so."[59]  That time still has not arrived.

## Conclusion

IT IS THEREFORE ORDERED that a decision on the application to proceed *in forma pauperis* (ECF Nos. 1, 3) is deferred.

IT IS FURTHER ORDERED that:

- **The Eighth Amendment medical-indifference claims and the ADA and RA disability-discrimination claims are DISMISSED** without prejudice and without leave to amend currently;

- **The First Amendment Free Exercise Clause and RLIUPA claims about religious exercise are DISMISSED** without prejudice and without leave to amend in this action as they are not properly joined.

- **All claims against C. Daniels, M. Minev, W.S.C.C. Medical Director, N.D.O.C. Medical Director, Nevada Dept. of Corr. Director are dismissed without prejudice from this action, so the Clerk of Court may terminate them as parties.**

---

[58] ECF No. 13.

[59] ECF No. 2 at 3.

- **This case proceeds only on the Eighth Amendment claim about indifference to coronavirus conditions against I. Bacca and K. Olsen.**

IT IS FURTHER ORDERED that the motions for free copies of all documents and a decision on that motion **(ECF Nos. 10, 11, 12, 13) are DENIED**.

Given the nature of the claim that I have permitted to proceed, IT IS FURTHER ORDERED that **this action is STAYED for 90 days** to allow the parties an opportunity to settle their dispute before the $350 filing fee is paid, an answer is filed, or the discovery process begins. During this 90-day stay period and until the court lifts the stay, no other pleadings or papers may be filed in this case, and the parties may not engage in any discovery, nor are the parties required to respond to any paper filed in violation of the stay unless specifically ordered by the court to do so. **I refer this case to the Court's Inmate Early Mediation Program** and will enter a subsequent order about that matter. Regardless, on or before 90 days from the date this order is entered, the Office of the Attorney General must file the report form attached to this order regarding the results of the 90-day stay, even if a stipulation for dismissal is entered before the end of the 90-day stay. If the parties proceed with this action, the court will then issue an order about service on defendants and setting a date for defendants to file an answer or other response. Once an answer is filed, the court will issue a scheduling order setting discovery and dispositive motion deadlines.

"Settlement" may or may not include payment of money damages. It also may or may not include an agreement to resolve Elliott's issues differently. A compromise agreement is one in which neither party is completely satisfied with the result, but both have given something up and both have obtained something in return.

If the case does not settle, then the court will determine whether to grant Elliott's *in forma pauperis* application. Elliott will be required to pay the full $350 statutory filing fee for a civil action regardless of whether the court grants his *in forma pauperis* application. This fee cannot be waived, and the fee cannot be refunded once the court enters an order granting Elliott's application to proceed *in forma pauperis*. If Elliott is allowed to proceed *in forma pauperis*, the fee will be paid in installments from his prison trust account. *See* 28 U.S.C. § 1915(b). But if Elliott is not allowed to proceed *in forma pauperis*, the full $350 statutory filing fee for a civil action plus the $52 administrative filing fee, for a total of $402, will be due immediately.

If any party desires to have this case excluded from the inmate mediation program, that party must file a "motion to exclude case from mediation" no later than 21 days before the date set for mediation. The responding party will have seven days to file a response, and no reply may be filed. Thereafter, the court will issue an order, set the matter for hearing, or both.

If Elliott needs an interpreter to participate in the mediation program, he must file a notice identifying the interpretation language and the need for the interpreter within 30 days from the date of this order.

IT IS FURTHER ORDERED that **the Clerk of Court is directed to ADD** the Nevada Department of Corrections to the docket as an Interested Party and electronically provide a copy of this order and copies of all items previously filed in this case by regenerating the Notices of Electronic Filing on the Office of the Attorney General of the State of Nevada by adding the Attorney General of the State of Nevada to the interested party on the docket. This does not indicate acceptance of service.

IT IS FURTHER ORDERED that **the Attorney General's Office must advise the Court within 21 days of the date of the entry of this order whether it will enter a limited**

**notice of appearance on behalf of Interested Party** for the purpose of participation in the Inmate Early Mediation Program.  No defenses or objections, including lack of service, will be waived because of the filing of the limited notice of appearance.

IT IS FURTHER ORDERED that **the Clerk of Court is directed to SEND** plaintiff Robert Elliott a courtesy copy of his first amended complaint (ECF No. 9).

Dated: July 19, 2024

_____
U.S. District Judge

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Robert Elliott,

        Plaintiff

v.

State of Nevada, et al.,

        Defendants

Case No.:  2:23-cv-00680-JAD-NJK

**Attorney General's Report of
Results of 90-Day Stay**

**NOTE: This form must be filed only by the Office of the Attorney General.
The inmate plaintiff MUST NOT file this form.**

On July 19, 2024, the court issued its order stating that it had conducted its screening under 28 U.S.C. § 1915A, and that a specified claim in this case would proceed.  The court ordered the Office of the Attorney General of the State of Nevada to file a report 90 days after the date of the entry of the Court's screening order to indicate the status of the case at the end of the 90-day stay.  By filing this form, the Office of the Attorney General hereby complies with that order.

**REPORT FORM**

[Identify which of the following two situations (identified in bold type) describes the case, and follow the instructions corresponding to the proper statement.]

**Situation One: Mediated Case**: **The case was assigned to mediation by a court-appointed mediator during the 90-day stay.**  [If this statement is accurate, check **ONE** of the six statements below and fill in any additional information as required, then proceed to the signature block.]

    _____    A mediation session with a court-appointed mediator was held on _____, and as of this date, the parties have reached a settlement (*even if paperwork to memorialize the settlement remains to be completed*).  (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in the case until a specified date upon which they will file a stipulation of dismissal.*)

    _____    A mediation session with a court-appointed mediator was held on _____, and as of this date, the parties have not reached a settlement. The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____ No mediation session with a court-appointed mediator was held during the 90-day stay, but the parties have nevertheless settled the case. (*If this box is checked, the parties are on notice that they must SEPARATELY file a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

_____ No mediation session with a court-appointed mediator was held during the 90-day stay, but one is currently scheduled for _____.

_____ No mediation session with a court-appointed mediator was held during the 90-day stay, and as of this date, no date certain has been scheduled for such a session.

_____ None of the above five statements describes the status of this case. Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

**Situation Two: Informal Settlement Discussions Case**: **The case was NOT assigned to mediation with a court-appointed mediator during the 90-day stay; rather, the parties were encouraged to engage in informal settlement negotiations.** [If this statement is accurate, check **ONE** of the four statements below and fill in any additional information as required, then proceed to the signature block.]

_____ The parties engaged in settlement discussions and as of this date, the parties have reached a settlement (*even if the paperwork to memorialize the settlement remains to be completed*). (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

_____ The parties engaged in settlement discussions and as of this date, the parties have not reached a settlement. The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____ The parties have not engaged in settlement discussions and as of this date, the parties have not reached a settlement. The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____ None of the above three statements fully describes the status of this case. Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

Date:_____

Signature of attorney

_____

Printed name

_____

Address

_____

Telephone number

Email address

2